UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ANDREW P. HOENECKE,

        Plaintiff,

v.

                                            Case No. 25-cv-0638-bhl

HOLMAN ENTERPRISES, INC. and
AUTOMOTIVE RENTALS, INC.,

        Defendants.

## ORDER GRANTING MOTION TO DISMISS

      Plaintiff Andrew Hoenecke, proceeding without an attorney, alleges that Defendants Holman Enterprises, Inc. (Holman) and Automotive Rentals, Inc. (ARI), tortiously interfered with his employment at Greater Milwaukee Auto Auction (GMAA) by causing GMAA to discriminate against him because of his gender. Defendants have moved to dismiss, arguing that Hoenecke's amended complaint fails to state a claim under Wisconsin law. Because Hoenecke's allegations are insufficient as a matter of law to state a claim for tortious interference with an employment contract, Defendant's motion will be granted and the case dismissed.

### BACKGROUND[1]

      Hoenecke served as Fleet Manager at GMAA beginning in February 2020. (ECF No. 15 ¶3.) To secure business with Defendants Holman and ARI, Hoenecke arranged for one of Defendants' remarketing Representatives, Linda Marubio, to conduct a site visit at GMAA on August 29, 2024. (*Id.* ¶5.) The night before the visit, Hoenecke hosted a dinner meeting with Marubio, and two GMAA executives, GMAA owner and President, Kristie Letizia, and GMAA General Manager, Veronica Kireem. (*Id.* ¶6.) During the dinner, Marubio shared that she is a lesbian. (*Id.* ¶7.)

---

[1] This Background is derived from Plaintiff's amended complaint, (ECF No. 5), the allegations in which are presumed true when considering a motion to dismiss. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–56 (2007).

The following day, Marubio conducted a site visit at GMAA. (*Id.* ¶¶9–12.) Before she left later that afternoon, Marubio told Hoenecke (with Letizia present) that she had no issues with GMAA, but that she would also visit a competitor's site before awarding any business. (*Id.* ¶¶8–12.) Several days later, however, Letizia informed Hoenecke that Marubio had "failed" the GMAA site because she had been unable to tour the entire facility and some of the vehicles she had inspected did not meet Defendants' reconditioning standards. (*Id.* ¶14.)

Letizia then began communicating directly with Marubio to try to secure Defendants' business. (*Id.* ¶16.) Letizia met with Marubio and others at a remarketing conference in Florida where, according to Hoenecke, she learned that Marubio had a different, "real reason" for failing the GMAA site. (*Id.* ¶19). Hoenecke claims Letizia told him that Marubio had decided to fail GMAA "as soon as she got in the car with" Hoenecke because Marubio preferred to work with women. (*Id.* ¶¶18–20.) After hearing Letizia's report, Hoenecke came to believe that his job would be in jeopardy if GMAA secured Defendants' business. (*Id.* ¶22.)

In February 2025, Marubio planned another site visit to GMAA and, in advance of the visit, held a conference call with GMAA staff. (*Id.* ¶27–28.) Hoenecke was not included in the call even though he had arranged the initial site visit and believed the account would normally be assigned to him as Fleet Manager. (*Id.* ¶29.) Letizia later informed Hoenecke that he was not included because he is a man. (*Id.* ¶31.) She further told him Marubio would work directly with GMAA General Manager Kireem because Kireem is a woman. (*Id.* ¶31.) Letizia also instructed him that he would not be directly involved in managing the account but would still be expected to perform support tasks, which he viewed as a de facto demotion. (*Id.* ¶32.)

Hoenecke continued to perform work to help secure the account. (*Id.* ¶34.) He became convinced, however, that he was being excluded from managing Defendants' account due to his gender. (*Id.* ¶¶40–43.) On March 3, 2025, he emailed a "letter of intent to sue" to Letizia accusing her of taking discriminatory action at the behest of Marubio. (*Id.* ¶¶42–43.) Letizia responded the next day, requesting that Hoenecke return to work and "drop [his] potential EEOC claim." (*Id.* ¶46.) Hoenecke replied that he would not drop his claim for gender discrimination and Letizia would either need to resolve the discrimination or prepare an acceptable severance agreement. (*Id.* ¶47.) Letizia responded that she would "work on a severance package for [Hoenecke's] resignation," and Hoenecke was removed from company access to GMAA's email and platform the same day. (*Id.* ¶¶ 48, 52.) Hoenecke's employment with GMAA was terminated on or around

March 4, 2025. (*Id.* ¶52.) On March 5, 2025, Hoenecke received an email from GMAA's counsel, but ultimately was not offered a severance package. (*Id.* ¶¶54–57.)

## ANALYSIS

Hoenecke's sole claim is that Defendants tortiously interfered with his employment at GMAA when their agent, Marubio, threatened to withhold their business from GMAA unless he was removed from the account. (ECF No. 15 ¶1.) Hoenecke further alleges that Marubio wanted him removed because he is male. (*Id.* ¶¶1–20). He alleges that the inference caused his "exclusion, demotion, and termination[.]" (*Id.* ¶87)

To state a claim for tortious interference with contract under Wisconsin law, a plaintiff must plausibly allege: (1) a contract or prospective contractual relationship with a third party; (2) interference by the defendant with that relationship; (3) the interference was intentional; (4) there was a causal connection between the interference and damages; and (5) the defendant was not justified or privileged to interfere. *See Briesemeister v. Lehner*, 720 N.W.2d 531, 542 (Wis. Ct. App. 2006). Defendants argue that Hoenecke has failed to allege sufficient facts to establish elements two through five. (ECF No. 19 at 9–12.)

Hoenecke alleges that Defendant's interference harmed his employment in three ways: (1) he was excluded from Defendants' account; (2) he was functionally demoted from his position; and (3) he was eventually terminated from his position at GMAA. The first two forms of interference – Hoenecke's alleged exclusion from managing the Holman account and his alleged demotion – are not actionable forms of interference with employment under Wisconsin law. Hoenecke does not support either form with allegations of any specific contractual right that Defendants' conduct diminished. His third alleged form of interference – termination – would plainly be an actionable form of interference with employment, but this avenue also fails because Hoenecke does not allege sufficient facts to allow the Court to infer that Defendants intended to cause his termination.

I. **Plaintiff's Alleged Exclusion from Managing the Holman Account Is Not Actionable Through a Tortious Interference Claim.**

Wisconsin recognizes a claim for tortious interference even when the contract at issue is not actually breached, if the defendant's actions caused the plaintiff to lose a right under his contract or made his contract rights "more costly or less valuable." *Sampson Invs. v. Jondex Corp.*, 499 N.W.2d 177, 184 (Wis. 1993). In *Wolnak v. Cardiovascular & Thoracic Surgeons of Cent.*

*Wis., S.C.*, the Wisconsin Court of Appeals recognized the propriety of a counterclaim for tortious interference where the alleged interference forced the counterclaimant to renegotiate a more expensive contract with an employee. 706 N.W.2d 667, 676 (Wis. Ct. App. 2005). But Wisconsin law recognizes a corollary to this rule. Where the alleged interfering conduct does not cause the plaintiff to lose a right or impair the value of his bargain in some way, the interference is not actionable. For instance, in *Sampson*, a commercial landlord sued its tenant for failing to maintain a grocery store while the tenant continued to pay rent. *Sampson*, 499 N.W.2d at 184. The plaintiff also sued a third party for tortious interference with contract based on the third party's having induced the tenant to move to a different location. *Id.* Both claims failed. Because the lease agreement did not require the tenant to continuously operate a retail store, the court held that allowing a tortious interference claim would be tantamount to providing the landlord with new, and un-bargained for, contractual rights. *Id.*

Hoenecke alleges that Marubio asked that he be "excluded" from managing the Holman account. (ECF No. 15 ¶1.) He further contends that Marubio initially "failed" his employer's site in August of 2024, and declined to give GMAA a "pilot" because Marubio preferred to work with women, and that these facts were communicated to him by his employer, Letizia. (*Id.* ¶¶5–20.) He also complains that he was not included on a conference call arranged by Marubio and Letizia in February of 2025, and not invited to a meeting on February 19, 2025, although he eventually attended the meeting. (*Id.* ¶¶28–37.) Finally, he contends that he was not given the task of communicating with Marubio about the Holman account. (*Id.* ¶¶31–32.) Nowhere in these allegations does Hoenecke contend that his employment contract with GMAA gave him a contractual right to any of these things. This dooms his claim. Because Hoenecke has not asserted a specific contractual right that was taken from him or devalued by Defendants' alleged conduct, he cannot pursue a tortious interference claim under Wisconsin law. *Sampson*, 499 N.W2d at 184 ("Even where there has been no breach of a contract, a plaintiff seeking to maintain a claim for tortious interference with contract must show some specific right which has been interfered with.").

Similarly, Hoenecke alleges that he was "in essence" demoted by being assigned support tasks for the Holman account, without managing the account. (ECF No. 15 ¶32.) He does not allege any reduction in pay, benefits, or change in job title that would indicate a demotion that impaired a specific contractual right. Although an actual demotion might be actionable under

Wisconsin law, *see Wolnak*, 706 N.W.2d at 676, Wisconsin courts have not recognized a mere change in job duties as sufficient to sustain a claim for tortious interference with employment. *See Sampson*, 499 N.W.2d at 184 (holding tortious interference claim requires "some specific right" be interfered with); *Mackenzie v. Miller Brewing Co.*, 608 N.W.2d 331, 353 (Wis. Ct. App. 2000) (expressing skepticism at an at-will employee's interest in a promotion). GMAA's alleged changes to his job duties on a single account, not including an actual change in title, benefits, or wages, do not support a tortious interference claim under Wisconsin law.

Hoenecke also asserts that Defendants "intentionally interfered" with his employment through Marubio's request, knowing that it would "disrupt and interfere with his job responsibilities and potential employment." (ECF No. 15 ¶85.) As discussed above, changes in his job responsibilities are not actionable under Wisconsin law. And Hoenecke does not allege any facts suggesting that other employers' decisions not to hire him are causally related to Marubio's conduct. (*See* ¶¶22–25.) He merely indicates that he asked Tom Stewart, a third party, to help him seek work at other companies but then asserts he kept those conversations confidential to not disrupt his work at GMAA. (*Id.*) There is nothing alleged to suggest that Defendants had any knowledge that he was seeking other work or did anything in relation to his job search. These facts do not support a claim under Wisconsin law.

II. **The Amended Complaint Does Not Allege Facts Suggesting that Defendants Intentionally Interfered with Plaintiff's Employment to Cause his Termination, or that Their Interference Caused His Termination.**

Hoenecke alleges that Marubio's request not to work with him on the Holman account caused GMAA to terminate his employment. (*Id.* ¶87.) His termination at GMAA would be actionable interference with employment. *Sampson*, 499 N.W.2d at 184; *Briesemeister,* 720 N.W.2d at 542. To survive this motion to dismiss, Hoenecke must plead facts that would permit a reasonable inference that Defendants interfered with his contract, the interference was intentional, that there is a causal connection between the interference and his termination, and that Defendants were not justified or privileged to interfere. *Briesemeister*, 720 N.W.2d at 542.

Hoenecke has not pleaded facts sufficient to support an inference that Marubio intentionally requested GMAA exclude him from the Holman account with the purpose of causing the termination of his employment, or knowledge that his termination was substantially certain to occur. *Id.* at 544; *Augustine v. Anti-Defamation League of B'Nai B'Rith*, 249 N.W.2d 547, 554

(Wis. 1977).  To determine whether interference was intentional, courts may consider the defendants' statements and actions and infer that a person intends the natural and probable consequences of their actions.  *Briesemeister*, 720 N.W.2d at 544.  To be liable, the defendant must either act for the specific purpose of interfering with the plaintiff's employment contract or despite knowing that such interference was "'certain, or substantially certain, to occur[.]'" *Augustine*, 249 N.W.2d at 554 (quoting Restatement, Torts, sec. 766, p. 43, comment j) (holding defendant's comment to radio station about plaintiff talk show host's handling of bigoted guest could not constitute tortious interference with plaintiff's employment contract because defendant only intended to influence radio station policy).  In *Funk v. Sara Lee Corporation*, a former employee's claim for tortious interference with contract was dismissed because the plaintiff "failed to allege intentional actions on the part of defendants" in her complaint.  699 F.Supp. 1365, 1366 (E.D. Wis. 1988).

Here, Hoenecke used the word intentional, (ECF No. 15 ¶85), as Defendants note, but not in relation to the few substantive factual allegations involving Marubio or Defendants.  *Id.* (ECF No. 19 at 9–10.)  He alleges that Marubio attended a dinner, attended a site visit at GMAA, did not initially award a pilot to GMAA, eventually arranged a conference call and a meeting with GMAA in February 2025 (that he was not invited to by his employer), and then communicated with Veronica Kireem, a general manager at GMAA.  (*Id.* ¶¶6–14, 28–31, 36–37.)  All other factual assertions are filtered through statements made by Letizia, and those alleged statements do not actually link Marubio and Defendants to his termination.  (*Id.* ¶¶20, 31.)  He alleges no facts suggesting that Defendants knew that not working on the Holman account would lead to his firing.  Hoenecke merely relies on his own factual conclusions, his own text sent to a friend, and his own unsuccessful job search as support for an inference that Marubio intended that GMAA fire him.  (*Id.* ¶¶ 21, 23–25, 40.)  But his own text to a friend expressing his fear that Marubio was conspiring against him does not meet his burden at the pleading stage.

The only relevant facts alleged are that Letizia told Hoenecke that "[Marubio] prefers not to work with men because she is gay", (ECF No. 15 ¶¶20–21), and that "[he] would not be communicating with [Marubio] on this account because [he is] a man" and that she would instead be working with Kireem.  (*Id.* ¶31.)  Neither of these alleged facts about Marubio would permit a plausible inference that she or Defendants acted for the purpose of inducing GMAA to terminate Hoenecke's employment, or with knowledge that his termination was substantially likely to occur.

Although Hoenecke alleges that Defendants' actions ultimately caused his termination, he does not allege facts supporting an inference that they requested his exclusion knowing it would result in his termination. (*See* ECF No. 15 ¶85 (alleging that Defendants knew their actions "would disrupt and interfere with [Plaintiff's] job responsibilities and *potential* employment.") (emphasis added); *see also* ECF No. 22 at 2–3 (arguing interference based on exclusion and change in job duties, not termination).) Indeed, the amended complaint makes clear that Hoenecke's employment with GMAA was not in jeopardy until he prepared a "14-day letter of intent to sue" demanding that GMAA either end the workplace discrimination or provide him with a severance agreement. (See ECF No. 15 ¶¶42–48.) Thus, based on Hoenecke's own allegations, Defendants could not have known, or had reason to know, when Marubio made her request, either in October 2024, or in February 2025, (*id.* ¶18–22; ¶1), that doing so would result in his termination.

## CONCLUSION

For the reasons stated above, the Court concludes that Hoenecke has not stated a claim for tortious interference with contract. In the event of dismissal, Hoenecke requests leave to file a second amended complaint adding evidence supporting his claim but, as Defendants point out, he has not filed a motion requesting leave to amend his first amended complaint and has not asked for Defendants' consent to amend. *See* Fed. R. Civ. P. 7(b)(1), 15(a)(2); (ECF No. 22 at 3–4; ECF No. 23 at 5–6.) While the Court is normally generous in granting leave to amend, that generosity has limits. Here, Hoenecke has already availed himself of the opportunity to amend his initial complaint; the pending motion relates to an amended complaint. (*See* ECF Nos. 13–15, 18.) Moreover, the allegations in the amended complaint, even taken as true, are legally insufficient and it is clear to the Court that further amendment would not cure the deficiencies it has identified. Accordingly, the Court's dismissal will be with prejudice and without leave to amend. *See Bogie v. Rosenberg*, 705 F.3d 603, 608 (7th Cir. 2013) (citation omitted) ("Leave to amend need not be granted . . . if it is clear that any amendment would be futile.").

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss, ECF No. 18, is **GRANTED** and the case is **DISMISSED with prejudice**. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin on September 23, 2025.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge